1  KEKER, VAN NEST & PETERS LLP
   BENJAMIN BERKOWITZ - # 244441
2  bberkowitz@keker.com
   CHRISTINA LEE - # 314339
3  clee@keker.com
   IAN KANIG - # 295623
4  ikanig@keker.com
   633 Battery Street
5  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
6  Facsimile:    415 397 7188

7  Attorneys for Defendant
   TWILIO INC.

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11

12  JONATHON PERRY-HUDSON, individually       Case No. 3:24-cv-03741-VC
    and on behalf of all others similarly situated,
13                                             **DEFENDANT TWILIO INC.'S NOTICE
                Plaintiff,                     OF MOTION AND MOTION TO
14                                             COMPEL INDIVIDUAL ARBITRATION;
           v.                                  MEMORANDUM OF POINTS AND
15                                             AUTHORITIES IN SUPPORT**
    TWILIO INC.,
16                                             **Pursuant to Fed. Arb. Act., 9 U.S.C. § 4**
                Defendant.
17                                             Date:        November 21, 2024
                                               Time:        10:00 a.m.
18                                             Courtroom:   4 — 17th Floor
                                               Judge:       Hon. Vince Chhabria
19
                                               Date Filed:  June 21, 2024
20                                             Trial Date:  Not Yet Set

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

                                                                                          **Page**

I.      INTRODUCTION ......................................................................................................2

II.     BACKGROUND ........................................................................................................4

        A.      Plaintiff purchased a men's hair loss treatment from the Keeps website and
                agreed to individually arbitrate any related claims under New York law. .................4

        B.      Plaintiff alleges that Keeps secretly shared his information with Twilio and
                asserts class action privacy claims under California law against Twilio alone. .........5

        C.      Keeps broadly discloses in its Privacy Policy that it shares its customers'
                information with third-party vendors for marketing and advertising. ........................5

III.    LEGAL STANDARD..................................................................................................6

IV.     ARGUMENT ..............................................................................................................7

        A.      Twilio is entitled to enforce Plaintiff's individual arbitration agreement with
                Keeps as a nonsignatory under California's doctrine of equitable estoppel. ..............7

                1.      Plaintiff's claims are intertwined with his contract with Keeps because
                        they require interpretation and enforcement of its Privacy Policy. ..................9

                        a.      Plaintiff's privacy claims require him to prove that Keeps did not
                                disclose that it may share his information with Twilio............................9

                        b.      The Keeps Privacy Policy speaks to whether Keeps may share
                                information with third parties for advertising and marketing. ................10

                        c.      Decisional law confirms that Plaintiff's privacy claims are thus
                                intertwined with the terms set out in the Keeps Privacy Policy. ............11

                2.      Plaintiff's allegations that Keeps and Twilio colluded to invade his
                        privacy are similarly intertwined with the Keeps Privacy Policy....................13

        B.      The Court should stay this action pending resolution of arbitration........................15

V.      CONCLUSION.........................................................................................................15

2737796

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Airtourist Holdings LLC v. HNA Grp.*,
No. C 17-04989 JSW, 2018 WL 3069444 (N.D. Cal. Mar. 27, 2018) .................................13

*Arthur Andersen LLP v. Carlisle*,
556 U.S. 624 (2009) ..........................................................................................................7

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ..........................................................................................................6

*Bernsley v. Barclays Bank Del.*,
657 F. Supp. 3d 1327 (C.D. Cal. 2023) ...........................................................................7

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ..........................................................................10

*Carter v. Spiegel*,
No. 21-CV-03990-TSH, 2022 WL 126303 (N.D. Cal. Jan. 13, 2022) ..............................14

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) ..........................................................................................8

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003) ............................................................................................................7

*Coinmint v. DX Corr Design*,
No. 23-CV-00599-RS, 2023 WL 9595893 (N.D. Cal. Apr. 24, 2023) ..............................15

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ..........................................................................................................7

*Duval v. Costco Wholesale Corp.*,
No. 22-CV-02338-TSH, 2023 WL 3852694 (N.D. Cal. June 5, 2023) ..............................7

*Franklin v. Cmty. Reg'l Med. Ctr.*,
998 F.3d 867 (9th Cir. 2021) .................................................................................4, 9, 11

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ..........................................................................3, 9

*Hammerling v. Google, LLC*,
No. 22–17024, 2024 WL 937247 (9th Cir. Mar. 5, 2024) ..............................................3, 10

*In re Henson*,
869 F.3d 1052 (9th Cir. 2017) ..........................................................................................8

2737796

*Herrera v. Cathay Pac. Airways Ltd.*,
    104 F.4th 707 (9th Cir. 2024) ................................................................ *passim*

*Hunt v. Meta Platforms, Inc.*,
    — F. Supp. 3d ——, 2024 WL 2503118 (N.D. Cal. May 24, 2024) ........................3, 12, 13, 15

*Kramer v. Toyota Motor Corp.*,
    705 F.3d 1122 (9th Cir. 2013) ................................................................7

*Mundi v. Union Sec. Life Ins. Co.*,
    555 F.3d 1042 (9th Cir. 2009) ................................................................7

*In re Pac. Fertility Ctr. Litig.*,
    814 F. App'x 206 (9th Cir. 2020) ........................................................9, 11

*Salas v. Universal Credit Servs., LLC*,
    No. 17-CV-2352 JLS, 2019 WL 1242448 (S.D. Cal. Mar. 18, 2019) ........................3, 14, 15

*Sanders v. Swift Transp. Co. of Arizona, LLC*,
    843 F. Supp. 2d 1033 (N.D. Cal. 2012) ................................................14

*Smith v. Spizzirri*,
    601 U.S. 472 (2024) ................................................................15

*Thomasson v. GC Services Ltd. P'ship*,
    321 Fed. App'x. 557 (9th Cir. 2008) ................................................10

*United States v. Sutcliffe*,
    505 F.3d 944 (9th Cir. 2007) ................................................................7

*Uptown Drug Company v. CVS Caremark Corporation.*,
    962 F. Supp. 2d 1172 (N.D. Cal. 2013) ........................................12, 13

*Young v. ByteDance Inc.*,
    700 F. Supp. 3d 808 (N.D. Cal. 2023) ................................................4, 9

**State Cases**

*Flanagan v. Flanagan*,
    27 Cal. 4th 766 (2002) ................................................................10

*Goldman v. KPMG LLP*,
    173 Cal. App. 4th 209 (2009) ................................................................8

*Hernandez v. Hillsides*,
    47 Cal. 4th 272 (2009) ................................................................10

**Federal Statutes**

9 U.S.C. § 1 ................................................................6

9 U.S.C. § 3 ..................................................................................................................1, 15

9 U.S.C. § 4 ........................................................................................................................1

**State Statutes**

Cal. Pen. Code § 631 ..................................................................................................5, 9, 10

Cal. Pen. Code § 632 ......................................................................................................5, 10

**Constitutional Provisions**

Cal. Const., Art. I § 1 ...................................................................................................3, 5, 10

TWILIO'S MOTION TO COMPEL INDIVIDUAL ARBITRATION
Case No. 3:24-cv-03741-VC

2737796

## TWILIO'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 21, 2024 at 10:00 a.m., or as soon thereafter as counsel may be heard, before the Honorable Vince Chhabria in Courtroom 4, on the 17th Floor of the Phillip Burton Federal Building and U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, Defendant Twilio Inc. ("Twilio") will and hereby does move to compel this action to individual arbitration and stay this action pending resolution of arbitration.

Twilio moves to compel individual arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4. Plaintiff entered into a valid and enforceable arbitration agreement with non-party Thirty Madison, Inc. (doing business as "Keeps") when he made a purchase on the Keeps website and agreed to the Keeps Terms & Conditions. That arbitration agreement covers Plaintiff's claims in this action. And that agreement contains a class action waiver that precludes any class action claims. Twilio is entitled to enforce Plaintiff's arbitration agreement and class action waiver with Keeps under the California doctrine of equitable estoppel. Plaintiff's claims should thus be compelled to individual arbitration. Further, pursuant to Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, this action should be stayed pending resolution of that arbitration.

This motion is based on this notice of motion and motion, the following memorandum of points and authorities, the supporting declarations of Olivia Jahn and Ian Kanig and the exhibits attached thereto, and the pleadings, records, and other papers on file in this action, as well as any further briefing, evidence, or argument that may be presented to the Court.

Dated: August 19, 2024

KEKER, VAN NEST & PETERS LLP

By: _/s/ Ian Kanig_
BENJAMIN BERKOWITZ
CHRISTINA LEE
IAN KANIG

Attorneys for Defendant
TWILIO INC.

2737796

## I. INTRODUCTION

Defendant Twilio Inc. respectfully moves to compel Plaintiff Jonathon Perry-Hudson's claims in this action to individual arbitration. Plaintiff alleges that Keeps, a company that offers men's hair loss treatments, used Twilio's customer engagement software to collect information about a purchase he made on the Keeps website, build a customer profile about him, and send him internet ads related to hair loss treatments. Dkt. No. 1 ("Compl.") ¶¶ 5–7, 27–51.[1] Keeps's Privacy Policy informs its customers that it "may [] share your Personal Information with entities that assist us with marketing and advertising" and that "ad networks to which we belong may use your browsing activity . . . to show you interest-based advertisements." Declaration of Ian Kanig ("Kanig Decl.") ¶ 2 & Ex. A–C ("Keeps Privacy Policy") ¶ 8. Nevertheless, Plaintiff alleges that Keeps never disclosed it may share his information with third parties like Twilio, and that Keeps colluded with Twilio to secretly collect and use his information for marketing and advertising purposes. Compl. ¶ 56. But he has not sued Keeps in any forum. Declaration of Olivia Jahn ("Jahn Decl.") ¶ 4. Instead, he now asserts privacy claims under California law ***against Twilio***.

The reason why Plaintiff did not sue Keeps is likely found in his agreement with Keeps, which requires him to individually arbitrate any claims against Keeps under New York law. *See id.* ¶¶ 2–3; Kanig Decl. ¶¶ 5-6 & Exs. D & E ("Keeps Terms") ¶¶ 17–18 (the Terms cover "[a]ny dispute, claim, or controversy arising out of or relating in any way to [the] Terms," including "enforcement, interpretation or validity thereof," and "your use of the [Keeps] Site"). It appears that Plaintiff believes, by suing Twilio only, he can avoid his arbitration agreement with Keeps and assert, on behalf of a putative class, California law claims that are otherwise unavailable.

Plaintiff is wrong. Twilio is entitled to enforce Plaintiff's arbitration agreement with Keeps under the well-established doctrine of equitable estoppel. Equitable estoppel permits a nonsignatory defendant to compel a signatory plaintiff to arbitration: (1) "when the claims against the nonsignatory are intimately founded in and intertwined with the underlying contract"; or (2) "when the signatory alleges substantially interdependent and concerted misconduct by the

---

[1] Keeps is a DBA of non-party Thirty Madison, Inc., which operates several telehealth brands. To maintain consistency with Plaintiff's complaint, Twilio refers to Thirty Madison as Keeps.

nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 707, 711 (9th Cir. 2024). Both circumstances are present here.

*First,* Plaintiff's privacy claims against Twilio are "intimately founded in and intertwined with" the privacy rights and obligations that are set out in his agreement with Keeps. In support of his claims under the California Invasion of Privacy Act ("CIPA") and for invasion of privacy under the California Constitution and common law, Plaintiff must plead and prove that Keeps did not disclose it could share his customer information with third-party software vendors like Twilio. *See Hammerling v. Google, LLC*, No. 22–17024, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (the disclosure of a challenged data practice defeats California invasion of privacy claims as a matter of law); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020) (same for CIPA claims); *see also* Compl. ¶¶ 6, 76, 86, 89 (alleging that no disclosure occurred in support of each of his claims). Determining the adequacy of Keeps's disclosures requires this Court to interpret and enforce the Keeps Privacy Policy to which Plaintiff agreed. That is precisely the type of intertwinement that warrants equitable estoppel. *Hunt v. Meta Platforms, Inc.*, — F. Supp. 3d ——, 2024 WL 2503118, at *2 (N.D. Cal. May 24, 2024).

*Second,* Plaintiff also alleges "substantially interdependent and concerted misconduct" between Keeps and Twilio that is similarly "founded in or intimately connected with" the privacy rights and obligations set out in the Keeps Privacy Policy. Plaintiff's theory is that Keeps and Twilio unlawfully colluded to collect and use his customer information for their mutual profit. Compl. ¶¶ 27–51, 56. Because these allegations of concerted misconduct between Keeps and Twilio also turn on whether Keeps disclosed that it may share customer information with its third-party vendors, equitable estoppel is also warranted on these grounds. *See Salas v. Universal Credit Servs., LLC*, No. 17-CV-2352 JLS, 2019 WL 1242448, at *4 (S.D. Cal. Mar. 18, 2019).

Ultimately, "[t]he 'linchpin' of equitable estoppel is fairness." *Herrera*, 104 F.4th at 710. And it is unfair for Plaintiff, who agreed that New York law would decide questions about his Keeps contract in individual arbitration, to ask this Court to define the boundaries of that contract under California law in a class action against its software vendor Twilio. As this Court explained,

2737796

"Think of it this way: [the signatory plaintiff] could have also sued [the signatory] on essentially the same set of allegations. And had she done so, the arbitration agreement would no doubt apply. Equitable estoppel prevents [the plaintiff] from sidestepping that agreement by bringing claims only against [the nonsignatory defendant] instead." *Young v. ByteDance Inc.*, 700 F. Supp. 3d 808, 814, (N.D. Cal. 2023); *see also Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 875 (9th Cir. 2021) (adopting the argument that it is "a quite obvious, if not blatant, attempt to bypass [an] agreement's arbitration clause" to sue only a nonsignatory).

Twilio thus respectfully requests that this Court compel arbitration and stay this action.

## II. BACKGROUND

### A. Plaintiff purchased a men's hair loss treatment from the Keeps website and agreed to individually arbitrate any related claims under New York law.

Plaintiff alleges that he visited the Keeps website in early May 2024 to purchase a men's hair loss treatment. Compl. ¶ 5. To make that purchase, Plaintiff created an account with Keeps. Jahn Decl. ¶ 2. And to create that account, Plaintiff was required to agree—and did agree—to the Keeps Terms & Conditions and the Keeps Privacy Policy that they incorporated. *See id.* ¶ 3; *see also* Kanig Decl., Exs. A–C (Keeps Privacy Policy) & Exs. D–E (Keeps Terms),

The Keeps Terms include an arbitration provision and class action waiver. Kanig Decl., Exs. D–E ¶¶ 17–18. They cover "[a]ny dispute, claim, or controversy arising out of or relating in any way to these Terms; the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate; or your use of the Site, including products purchased or Service rendered through the Site. . . ." *Id.* ¶ 17. In agreeing to submit these disputes to arbitration, signatories expressly agree to "waiv[e] the right to a trial by jury or to participate in a class action." *Id.* The Keeps Terms specify that "the U.S. Federal Arbitration Act ["FAA"] governs the interpretation and enforcement of this provision," and that the procedural rules of arbitration are supplied by the American Arbitration Association's Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes ("AAA Rules"). *Id.* And, in any arbitration or action brought under this agreement, "the statutes and laws of the United States and the state of New York, USA, without regard to conflicts of laws

principles, will apply to all matters relating to use of this Site or use of the Service." *Id.* ¶ 16.

**B. Plaintiff alleges that Keeps secretly shared his information with Twilio and asserts class action privacy claims under California law against Twilio alone.**

Plaintiff alleges that, sometime after his Keeps purchase, he began to see internet ads for men's hair loss treatments on Facebook and other websites. Compl. ¶ 7. Plaintiff insinuates that he saw those ads because Keeps secretly installed Twilio's customer engagement software on its website to collect information about its customers, build profiles about them, and deliver internet ads about its products through its advertising partners. *Id.* ¶¶ 27–51. He alleges that "Keeps.com utilizes [Twilio's] Segment API on its Website and sends its consumers' [personal information] to Twilio in order to assist with Keeps'[s] [sic] marketing, advertising, and analytics efforts." *Id.* ¶ 29. Twilio's software "creates unified customer profiles" that "merges the complete history of each customer into a single profile, no matter where they interact with your business." *Id.* ¶¶ 30–31. Keeps then uses these profiles for "targeted marketing of advertisements at [customers who] fit specific parameters" through internet advertising partners like Meta and Google. *Id.* ¶¶ 34–35.

But Plaintiff has filed this class action lawsuit under California law against Twilio alone. He asserts two claims under the CIPA for unauthorized wiretapping and eavesdropping, as well as invasion of privacy claims under the California Constitution and California common law. *Id.* ¶¶ 68–78 (CIPA claim under Cal. Pen. Code § 631(a)); *id.* ¶¶ 79–87 (CIPA claim under Cal. Pen. Code § 632); *id.* ¶¶ 88–94 (invasion of privacy claims); *see also id.* ¶¶ 57–67 (class allegations). In support of each of those claims, Plaintiff alleges that Keeps never disclosed it may share his information with third-party vendors like Twilio for marketing and advertising purposes. *Id.* ¶ 6 (generally), ¶ 76 (CIPA wiretapping), ¶ 86 (CIPA eavesdropping) & ¶ 89 (invasion of privacy).

**C. Keeps broadly discloses in its Privacy Policy that it shares its customers' information with third-party vendors for marketing and advertising.**

An essential component of Plaintiff's theory of this case—the allegation that Keeps never told him it would collect and share his information with third-party vendors like Twilio—is demonstrably false. In its Privacy Policy, Keeps repeatedly and broadly disclosed that it collects, aggregates, and shares information about its customers for marketing and advertising purposes.

TWILIO'S MOTION TO COMPEL INDIVIDUAL ARBITRATION
Case No. 3:24-cv-03741-VC

First, in a section of the Privacy Policy entitled "**COLLECTION OF PERSONAL INFORMATION**," Keeps told Plaintiff that it may collect information about them from numerous sources, including from customers themselves (*i.e.,* during account creation), internet advertising companies like Meta and Google (*i.e.,* from other internet activity), and customers' browsing activity on the Keeps website (*i.e.,* automatically through the use of browser cookies). Kanig Decl. ¶ 3, Ex. A ¶ 2. The information that Keeps collects from these sources includes their: (1) contact information; (2) account information; (3) financial information; (4) "personal characteristics," including "general medical history" and "other information relevant to diagnosis and treatment"; (6) "personal preferences, including product preferences, online preferences, and interests"; (7) "online behavior information including details of your visits to the Keeps website, online activity, time spent viewing features, traffic data, location data, logs, language, date and time of access, frequency, and other communication data"; and (8) device information. *Id.* ¶ 3.

Then, in the section entitled "**DISCLOSURE OF PERSONAL INFORMATION**," Keeps broadly disclosed that it may share this "personal information" with "third party vendors and service providers that perform services and functions on our behalf . . . in order to provide these services to us[.]" *Id.* ¶ 4. Keeps states in the "**ADVERTISEMENT**" section that it "may [] share your Personal Information with entities that assist us with marketing and advertising." *Id.* ¶ 8. And Keeps said that it "may use cookies and other information to provide relevant interest-based advertising to you, and ad networks to which we belong may use your browsing activity across participating websites to show you interest-based advertisements on those websites." *Id.*

Thus, and contrary to the core of Plaintiff's case, Keeps disclosed to its customers that it may share their information with third-party vendors like Twilio for marketing and advertising in its contract with Plaintiff. *See* Compl. ¶¶ 27–51. The question here is whether Plaintiff's claims, which turn on these disclosures in the Keeps Privacy Policy, must be resolved in arbitration.

## III.  LEGAL STANDARD

"[T]he Federal Arbitration Act (FAA) governs the enforceability of arbitration agreements in contracts involving interstate commerce[.]" *Herrera*, 104 F.4th at 706 (citing 9 U.S.C. § 1, *et seq.*). It espouses a "liberal federal policy favoring arbitration[.]" *AT&T Mobility LLC v.*

*Concepcion*, 563 U.S. 333, 339 (2011). Thus, the FAA "mandates that . . . courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

Because Plaintiffs' purchase of men's hair loss treatment from the Keeps website involves interstate commerce, the FAA governs Plaintiff's arbitration agreement. *See Duval v. Costco Wholesale Corp.*, No. 22-CV-02338-TSH, 2023 WL 3852694, at *2 (N.D. Cal. June 5, 2023) (holding that the FAA applies to sales on "a virtual marketplace through a smartphone application or website") (citing *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) ("[T]he Internet is an instrumentality and channel of interstate commerce.")); *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56–57 (stating that the FAA applies whenever, "in the aggregate," the activity at issue "bear[s] on interstate commerce in a substantial way"). Indeed, because Plaintiff is a California resident and Keeps is a New York resident, their agreement constitutes interstate commerce in and of itself. *Bernsley v. Barclays Bank Del.*, 657 F. Supp. 3d 1327, 1337 (C.D. Cal. 2023); Compl. ¶ 5 (Plaintiff's residency); Kanig Decl., Ex. A ¶ 8 (Keeps's residency).

Further, "a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013). "[S]tate law [may] allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *see also Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) ("General contract and agency principles apply in determining the enforcement of an arbitration agreement by or against nonsignatories.").

Thus, the FAA governs Plaintiff's arbitration agreement with Keeps, and Twilio is entitled to enforce that arbitration agreement in this action to the extent that applicable state law permits.

## IV. ARGUMENT

### A. Twilio is entitled to enforce Plaintiff's individual arbitration agreement with Keeps as a nonsignatory under California's doctrine of equitable estoppel.

When Plaintiff created his Keeps account in order to make his purchase, he was required

to agree to the Keeps Terms and the Keeps Privacy Policy.  Jahn Decl. ¶ 2.  In agreeing to the Keeps Terms, Plaintiff agreed to individually arbitrate any dispute relating to his purchase from Keeps, the Keeps Terms, the Keeps Privacy Policy, and his use of the Keeps website.  *Id.*  The Keeps Terms include an arbitration provision and class waiver, as described above, that are valid and enforceable under the FAA.  Kanig Decl., Exs. D & E ¶¶ 17–18.  This provision covers "[a]ny dispute, claim, or controversy arising out of or relating in any way to these Terms; the . . . enforcement, interpretation or validity thereof; . . . or your use of the Site, including products purchased or Service rendered through the Site[.]"  *Id.* ¶ 17.  Such "broad and far reaching" language covers this entire action, which arises out of Plaintiff's use of the Keeps website.  *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000) (where the "[r]esolution of the dispute would require an analysis of the [contract terms]," "[t]he dispute unquestionably arises out of or relates to [its] construction").  Thus, there is no question that Plaintiff entered into a valid and enforceable arbitration agreement that covers this lawsuit.

The only question is whether Twilio is entitled to enforce Plaintiff's arbitration agreement as a nonsignatory.  Under California's doctrine of equitable estoppel, the answer is yes.[2]  Equitable estoppel permits a nonsignatory defendant to enforce a signatory plaintiff's arbitration agreement in two circumstances.  *Herrera*, 104 F.4th at 711 (citing *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 221 (2009)).  One is enough to compel arbitration, but both are present here.

***First,*** Plaintiff's claims are intertwined with the privacy rights and obligations set out in the same contract with Keeps that contains the arbitration provision.  Each claim depends on the allegation that Keeps did not disclose that it would share customer information with third-party vendors for marketing and advertising purposes.  ***Second,*** Plaintiff's pervasive allegations that Keeps and Twilio colluded to violate his privacy are similarly intertwined with the privacy rights and obligations set out in Plaintiff's underlying contract with Keeps.  Plaintiff cannot "bypass" or

---

[2] California law controls whether Twilio may enforce the arbitration agreement between Keeps and Plaintiff under the doctrine of equitable estoppel, even though the Keeps Terms select New York law to govern the agreement notwithstanding any applicable conflict-of-law principles.  *See* Kanig Decl. ¶ 6, Exs. D & E ¶ 16.  This is because applying New York law on equitable estoppel would presuppose that Twilio can enforce Keeps's choice-of-law clause, which itself requires an equitable estoppel analysis.  *In re Henson*, 869 F.3d 1052, 1058–61 (9th Cir. 2017) (holding that California's law of equitable estoppel governs instead of selected New York law in this situation).

"sidestep[]" his agreement to individually arbitrate this dispute under New York law by tactically suing Twilio in a class action under California law. *See Franklin*, 998 F.3d at 875; *Young*, 700 F. Supp. 3d at 814. This implicates the "linchpin" of equitable estoppel: fairness. *See Herrera*, 104 F.4th at 710.

### 1. Plaintiff's claims are intertwined with his contract with Keeps because they require interpretation and enforcement of its Privacy Policy.

Twilio is entitled to enforce Plaintiff's arbitration agreement with Keeps because his claims against Twilio are "intimately founded in and intertwined with" the privacy rights and obligations that are set out in that same agreement. *See Herrera*, 104 F.4th at 711. To conduct this inquiry, courts must look to "the relationships of persons, wrongs and issues" alleged in the complaint, ***regardless*** of whether the plaintiff references the underlying contract containing the arbitration agreement. *Franklin*, 998 F.3d at 871. The purpose of "examining the facts alleged in the complaint" in this manner is to determine "whether they ***rely or depend on*** the terms, duties, or obligations in the contract containing the arbitration provision in asserting the claims." *In re Pac. Fertility Ctr. Litig.*, 814 F. App'x 206, 209 (9th Cir. 2020) (emphasis added). It does not matter if some of those allegations do not rely or depend on the underlying contract. "California law does not require that every allegation in the complaint be intertwined with the contract containing the arbitration clause for equitable estoppel to apply." *Herrera*, 104 F.4th at 710. Under this framework, Plaintiff's claims are plainly intertwined with his contract with Keeps.

### a. Plaintiff's privacy claims require him to prove that Keeps did not disclose that it may share his information with Twilio.

Each of Plaintiff's privacy claims require him to prove that Keeps did not disclose that it may share the information it collected about him with third-party vendors and service providers like Twilio. ***First,*** to succeed on a CIPA claim for intentional wiretapping, a plaintiff must prove that the defendant has made an "***unauthorized*** connection" with a "telegraph or telephone wire" or has attempted to read or learn the contents of a communication "***without the consent*** of all parties." Cal. Pen. Code § 631(a) (emphases added); *accord Google Assistant*, 457 F. Supp. 3d at 828 (an element of a wiretapping claim is the lack of authorization or consent from all parties).

2737796

**Second**, to succeed on a CIPA claim for eavesdropping, a plaintiff must similarly prove that the defendant has, "without the consent of all parties to a confidential communication," used an "electronic amplifying or recording device" to "eavesdrop" on the communication. Cal. Pen. Code § 632. This claim thus requires proof that the eavesdropping was done in secret, without the plaintiff's knowledge. *See Thomasson v. GC Services Ltd. P'ship*, 321 Fed. App'x. 557, 559 (9th Cir. 2008) ("California courts interpret 'eavesdrop,' as used in § 632, to refer to a third party secretly listening to a conversation between two other parties"); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1073 (N.D. Cal. 2021) ("A communication is confidential under Section 632 if a party 'has an objectively reasonable expectation that the conversation is not being overheard or recorded.'") (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776–77 (2002)).

And **third,** to succeed on an invasion of privacy claim under the California Constitution or the common law, a plaintiff must prove that (1) he had a reasonable expectation of privacy and (2) the defendant intruded on that privacy in a highly offensive manner. *Hernandez v. Hillsides*, Inc., 47 Cal. 4th 272, 286 (2009). Critically, whether a reasonable expectation of privacy exists and whether an intrusion into that privacy is highly offensive depends on whether the intrusion was disclosed to the plaintiff. *Hammerling*, 2024 WL 937247, at *3 (holding that the disclosure of a challenged data practice defeats California invasion of privacy claims as a matter of law).

Accordingly, Plaintiff alleges in support of each of his privacy claims that he did not know, consent, or authorize Keeps to share his information with third-party vendors like Twilio for marketing and advertising purposes. Compl. ¶¶ 6 (generally), 76 (CIPA Section 631 claim), 86 (CIPA Section 632 claim), 89 (invasion of privacy claims). Thus, it is beyond argument that Plaintiff's privacy claims each depend on the issue of disclosure, consent, and authorization.

      **b.**     **The Keeps Privacy Policy speaks to whether Keeps may share information with third parties for advertising and marketing.**

Having reviewed Plaintiff's complaint, the inquiry turns to Plaintiff's contract. That contract—composed of the Keeps Terms and the Keeps Privacy Policy—sets out in detail its customers' privacy rights and Keeps's privacy obligations. Kanig Decl. ¶¶ 2–6 & Exs. A–C (Keeps Privacy Policy) & Exs. D–E (Keeps Terms); *see also* Jahn Decl. ¶¶ 2–3.

2737796

Keeps informed its customers that it may share their "personal information" with "third party vendors and service providers that perform services and functions on our behalf . . . in order to provide these services to us[.]" *Id.*, Exs. A–C ¶ 4. Keeps also expressly disclosed that this personal information may include: (1) contact information; (2) "personal characteristics," including "general medical history" and "other information relevant to diagnosis and treatment"; (3) "personal preferences, including product preferences, online preferences, and interests"; and (4) "online behavior information including details of your visits to the Keeps website." *Id.* ¶ 3.

The Keeps Privacy Policy does not place limits on the third-party vendors and service providers to which Keeps may send this information. *See id.* Keeps also discloses that it "may [] share your Personal Information with entities that assist us with marketing and advertising." *Id.* ¶ 8. And it discloses that "ad networks to which we belong may use your browsing activity across participating websites to show you interest-based advertisements on those websites." *Id.*

Thus, the Keeps Privacy Policy provides that Keeps may collect and share with third parties personal information about its customers for marketing and advertising purposes.

**c.** **Decisional law confirms that Plaintiff's privacy claims are thus intertwined with the terms set out in the Keeps Privacy Policy.**

This intertwinement of Plaintiff's privacy claims and the privacy rights and obligations set out in the Keeps Privacy Policy—part of the contract containing his arbitration agreement—entitles Twilio to enforce Plaintiff's arbitration agreement in this action. To make a sufficient showing of intertwinement, Twilio need demonstrate only that this Court would have to interpret the disclosures set out in the Keeps Privacy Policy in order to adjudicate the dispute between Plaintiff and Twilio. *See Herrera*, 104 F.4th at 711; *Franklin*, 998 F.3d at 871; *Pac. Fertility*, 814 F. App'x at 209. As shown above, this is necessary here. Plaintiff cannot succeed on any of his privacy claims if the Keeps Privacy Policy discloses that Keeps may share his personal information with third-party vendors like Twilio for marketing and advertising purposes. Indeed, Plaintiff's claims cannot be evaluated or understood without the context of the data-usage disclosures in the Keeps Privacy Policy. Thus, Twilio is entitled to enforce the Keeps arbitration agreement against Plaintiff in this lawsuit under the first circumstance of equitable estoppel.

11

Decisional law from this District confirms that intertwinement exists here.  Recently, in *Hunt v. Meta Platforms*, the court granted Meta and Google's motions to compel individual arbitration on equitable estoppel grounds in a materially identical situation.  *See* 2024 WL 2503118, at *1–3.  There, the plaintiff alleged that H&R Block (an online tax-preparation service) contracted with Meta and Google (internet advertisers) to trick its customers into providing their personal information to H&R Block on its website so that it could be secretly shared with Meta and Google for advertising purposes.  *Id.* at *1.  The plaintiff asserted civil RICO claims against all three companies, including predicate wire-fraud claims.  *Id.* at *1–2.  The merits of those fraud predicates turned on whether H&R Block had disclosed to its customers in its Privacy Policy that it could share their information with third parties like Meta and Google.  *Id.* at *2.

Meta and Google moved to enforce the plaintiff's arbitration agreement with H&R Block on equitable estoppel grounds, arguing, just as here, that the plaintiff's claims were intertwined with the disclosures in the H&R Block Privacy Policy.  *Id.*  The court agreed in full.  Because the plaintiff's claims required him to prove that H&R Block's Privacy Policy did not disclose that H&R Block could share his personal information with Meta and Google, "[the plaintiff's] claims against Google and Meta by their own terms are closely intertwined with his agreement with H&R Block."  *Id.* at 2.  It did not matter that the plaintiff did not formally allege a breach of the agreement, or that his claims arose from statute.  Instead, "the question under California law is whether the claims 'are in *any way* founded in or bound up with the terms.'"  *Id.* at *3 (quoting *Herrera*, 94 F.4th at 1090–91).  "[B]ecause the [plaintiff's] claims allege fraud arising from the H&R Block agreements as one of the elements of his RICO claims, those claims are intimately intertwined with the H&R Block agreements (including the incorporated privacy notice)."  *Id.*

Similarly instructive is *Uptown Drug Company v. CVS Caremark Corporation*.  *See* 962 F. Supp. 2d 1172, 1184 (N.D. Cal. 2013).  There, the plaintiff, which provided pharmacy services through certain healthcare plans, was a competitor of CVS, which provided pharmacy services at retail stores.  *Id.* at 1176.  CVS merged with Caremark, a pharmacy services intermediary, which had a business relationship with the plaintiff that was subject to a contract containing an arbitration provision.  *Id.*  Following the merger, the plaintiff came to believe that Caremark

TWILIO'S MOTION TO COMPEL INDIVIDUAL ARBITRATION
Case No. 3:24-cv-03741-VC

2737796

disclosed its trade secret customer information to CVS without authorization.  *Id.*  The plaintiff

sued several CVS entities for trade secret misappropriation, unfair competition, and tortious

interference.  *Id.*  The CVS entities that had signed the contract moved to compel arbitration.  *Id.*

The CVS entities that did not sign the contract also moved to compel arbitration on

equitable estoppel grounds.  *Id.* at 1183.  These nonsignatories argued that the plaintiff's claims

were intertwined with its contract with Caremark because that contract "expressly addresses the

use, dissemination, and ownership of the customer information" at issue.  *Id.*  at 1184.  The court

agreed.  To determine whether intertwinement existed, the court first looked to the elements of

the plaintiff's claims and then the terms of the plaintiff's contract.  *See id.* at 1185.  The court

found that all but one of the plaintiff's claims required interpretation of the terms in that contract.

In short, "The question of whether Caremark was to any extent barred from disclosing or using

[the plaintiff's] customer data must be answered by looking at the terms of the [contract] because

that contract explicitly governs the collection and use of such information and because it provides

the underlying basis for [the plaintiff's] disclosure of such information."  *Id.* at 1185.  Thus, these

claims were plainly intertwined with the contract and equitable estoppel was appropriate.[3]  *Id.*;

*see also Airtourist Holdings LLC v. HNA Grp.*, No. C 17-04989 JSW, 2018 WL 3069444, at *3

(N.D. Cal. Mar. 27, 2018) (compelling arbitration because "the claims in the complaint are

premised upon the construction of the terms and foundational agreements" with the plaintiff).

Here, just as in *Hunt* and *Uptown Drug*, Plaintiff's claims are intertwined with the terms

and duties set out in his contract with Keeps and therefore should be compelled to arbitration.

### 2. Plaintiff's allegations that Keeps and Twilio colluded to invade his privacy are similarly intertwined with the Keeps Privacy Policy.

Twilio is also entitled to enforce Plaintiff's arbitration agreement with Keeps on equitable

estoppel grounds because Plaintiff alleges concerted misconduct between Twilio and Keeps that

is similarly intertwined with the privacy rights and obligations in the Keeps Privacy Policy.  *See*

*Hunt*, 2024 WL 2503118, at *3; *see also Herrera*, 104 F.4th at 711.  This second circumstance of

---

[3] In *CVS Caremark*, the court held that the plaintiff's unfair prong claim under the UCL was not
intertwined with his Caremark contract because it was predicated on unfair business practices that
had no relationship at all with the "rights or duties" set out in that contract.  *Id.*

equitable estoppel exists where a plaintiff alleges a signatory and nonsignatory have acted "jointly in furtherance of a common scheme," and the legality of that scheme cannot be resolved without looking to the terms of the plaintiff's contract. *See Sanders v. Swift Transp. Co. of Arizona, LLC*, 843 F. Supp. 2d 1033, 1038 (N.D. Cal. 2012) (compelling arbitration on this basis). Where the signatory is the "principal wrongdoer," in that it initiated and organized the common scheme with the nonsignatory, estoppel is particularly appropriate. *See Carter v. Spiegel*, No. 21-CV-03990-TSH, 2022 WL 126303, at *6 (N.D. Cal. Jan. 13, 2022) (compelling arbitration on this basis).

The core theory of Plaintiff's case is that Keeps colluded with Twilio to secretly collect and use Keeps customer information for their mutual profit. *See* Compl. ¶ 3 ("[Twilio] contracts with Keeps to enable the conduct at issue."); *id.* ¶¶ 27–51 (alleging how Keeps installed Twilio's software on the Keeps website so that Keeps could send customer information to Twilio); *id.* ¶ 56 (alleging that "the agreement for [Twilio] to wiretap [Keeps's customers'] communications on the [Keeps] Website is done for the purpose of improperly increasing the advertising efficacy and, by extension, profits of both parties"). Plaintiff's complaint is thus replete with allegations that Keeps and Twilio acted "jointly in furtherance of a common scheme" to profit from his customer information. *See Sanders*, 843 F. Supp. 2d at 1038. Indeed, it would have been impossible for Twilio to engage in the conduct that Plaintiff alleges without Keeps, which is the party that hired Twilio as a vendor, installed Twilio's software on its website, made the relevant disclosures in its Privacy Policy, and collected its customers' information. For that same reason, Twilio cannot be the "principal wrongdoer" described in this case. *See Carter*, 2022 WL 126303, at *6. Twilio is merely a third-party vendor that provided Keeps with a lawful software service.

These are precisely the kind of allegations of concerted misconduct that warrant equitable estoppel. For example, in *Salas v. Universal Credit Services, LLC*, the plaintiff enrolled in a debt settlement program with defendant Priority, pursuant to a contract with an arbitration provision. 2019 WL 1242448, at *1. Even though that contract "authorized" Priority to share the plaintiff's credit report with third parties to perform its services, the plaintiff sued it and several such third parties under credit reporting statutes. *Id.* at *4. The nonsignatories moved to compel arbitration, and the court granted their motions. *Id.* The allegations of "interdependent conduct" regarding

TWILIO'S MOTION TO COMPEL INDIVIDUAL ARBITRATION
Case No. 3:24-cv-03741-VC

2737796

the defendants' sharing of his credit report were "intimately connected to the obligations" set out in his contract because it addressed whether they could do so. *Id.* Further, it was "clear that all of the [d]efendants will rely on the [contract's disclosure] as a defense for their actions." *Id.*

Similarly, in *Coinmint v. DX Corr Design*, the plaintiff alleged that it was fraudulently induced into purchasing Bitcoin mining rigs from a nonparty (Katena) that it never received. *See* No. 23-CV-00599-RS, 2023 WL 9595893, at *1 (N.D. Cal. Apr. 24, 2023). The plaintiff initiated arbitration against Katena under their purchase agreement, but also sued several nonsignatories, including DX Corr (a third-party computer chip design company), DX Corr's owner, and several of its own employees, who all allegedly conspired to enable the fraudulent scheme. *Id.* The court granted the nonsignatory defendants' motion to compel arbitration on equitable estoppel grounds, finding that these conspiracy allegations were "grossly intertwined" with the plaintiff's claims, given the prevalence of allegations about the non-party signatory's misconduct. *Id.* at *3–4. "Far more than allegations of parallel misconduct resulting in discrete injuries to Plaintiff[]," "Plaintiff[] allege[s] a single scheme to achieve a single aim." *Id.* at *4. The same is true here.

Finally, in *Hunt v. Meta Platforms*, also discussed above, the court similarly found that the plaintiff had "alleged concerted misconduct" between H&R Block, Meta, and Google that was "undoubtedly connected to [his] underlying agreement with H&R Block[.]" 2024 WL 2503118, at *3. But because the court had already granted Meta and Google's arbitration motions on intertwinement grounds, it did not need to reach this further basis for equitable estoppel. *Id.*

**B. The Court should stay this action pending resolution of arbitration.**

Finally, Twilio requests a mandatory stay of this action pending resolution of individual arbitration. "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) (discussing 9 U.S.C. § 3). Thus, a stay is proper.

**V. CONCLUSION**

For the foregoing reasons, Twilio respectfully requests that this Court grant its motion to compel individual arbitration and stay this action pending resolution of that individual arbitration. ///

Dated:  August 19, 2024

KEKER, VAN NEST & PETERS LLP

By:  /s/ Ian Kanig

BENJAMIN BERKOWITZ
CHRISTINA LEE
IAN KANIG

Attorneys for Defendant
TWILIO INC.

TWILIO'S MOTION TO COMPEL INDIVIDUAL ARBITRATION
Case No. 3:24-cv-03741-VC

2737796