KEKER, VAN NEST & PETERS LLP
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
CHRISTINA LEE - # 314339
clee@keker.com
IAN KANIG - # 295623
ikanig@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendant
TWILIO INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JONATHON PERRY-HUDSON,<br><br>       Plaintiff,<br><br>     v.<br><br>TWILIO, INC.,<br><br>       Defendant. | Case No. 3:24-CV-03741-VC<br><br>**REPLY IN SUPPORT OF DEFENDANT TWILIO INC.'S MOTION TO COMPEL INDIVIDUAL ARBITRATION**<br><br>**Pursuant to Fed. Arb. Act., 9 U.S.C. § 4.**<br><br>Date:       October 31, 2024<br>Time:      10:00 a.m.<br>Courtroom:  4 — 17th Floor<br>Judge:     Hon. Vince Chhabria<br><br>Date Filed:  June 21, 2024<br>Trial Date:  Not Yet Set |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...........................................................................................................1

II.   ARGUMENT ...............................................................................................................2

    A.    The evidence is undisputed that Plaintiff agreed to the Keeps Terms, including
        its arbitration provision, class waiver, and choice of law. ..............................................2

    B.    The scope of Plaintiff's arbitration agreement, which includes any dispute
        relating to his use of the Keeps website, covers his claims in this action......................5

    C.    Plaintiff's remaining arguments against equitable estoppel are legally flawed............6

        1.    Plaintiff's claims are intimately intertwined with the Keeps Privacy
            Policy, which are incorporated by reference into the Keeps Terms. ....................7

            a.    The Keeps Terms validly incorporate the Keeps Privacy Policy, and
                thus the documents must be treated as a unified contract..........................7

            b.    Plaintiff does not dispute that his claims hinge on the Keeps
                Privacy Policy, but argues for an incorrect legal standard.........................8

        2.    Plaintiff barely disputes that his privacy claims against Twilio are
            predicated on interdependent misconduct between Twilio and Keeps...............10

III.  CONCLUSION..............................................................................................................10

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

5

*Ellington v. Eclipse Recreational Vehicles*
  2022 WL 72351 (9th Cir. Jan. 7, 2022) ..........................................................................9

6

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995) ...........................................................................................1, 3

7

8

*Franklin v. Cmty. Reg'l Med. Ctr.*,
  998 F.3d 867 (9th Cir. 2021) ........................................................................ *passim*

9

10

*Hansen v. LMB Mortg. Servs., Inc.*,
  1 F.4th 667 (9th Cir. 2021) ...........................................................................3, 4

11

*Herrera v. Cathay Pac. Airways Ltd.*,
  104 F.4th 702 (9th Cir. 2024) ......................................................................2, 6, 8

12

13

*Hoang v. Citibank*
  702 F. Supp. 3d 864 (N.D. Cal. 2023) .........................................................3, 5

14

15

*Hunt v. Meta Platforms*
  2024 WL 2503118 (N.D. Cal. May 24, 2024) ..............................................9, 10

16

*In re Holl*,
  925 F.3d 1076 (9th Cir. 2019) .............................................................................7

17

18

*Jackson v. Amazon.com*,
  65 F.4th 1093 (9th Cir. 2023) ...............................................................................5

19

20

*La Force v. GoSmith, Inc.*,
  2017 WL 9938681 (N.D. Cal. Dec. 12, 2017)......................................................5

21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).................................................................................................3

22

23

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017).....................................................................................4

24

25

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985).............................................................................................1, 6

26

*Peter v. DoorDash, Inc.*,
  445 F. Supp. 3d 580 (N.D. Cal. 2020) .................................................................4

27

28

*Poublon v. C.H. Robinson Co.*,
  846 F.3d 1251 (9th Cir. 2017) ..............................................................................4

*Scott v. Harris*,
    550 U.S. 372 (2007)..................................................................................................3

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999) ...................................................................................4

*Smith v. Google LLC*
    2024 WL 1171653 (N.D. Cal. Mar. 19, 2024)................................................8, 9, 10

*Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*,
    42 F.3d 1292 (9th Cir. 1994) ................................................................................5, 6

*Wilson v. Huuuge, Inc.*,
    944 F.3d 1212 (9th Cir. 2019) ..................................................................................4

*Young v. ByteDance Inc.*,
    700 F. Supp. 3d 808 (N.D. Cal. 2023) .....................................................................1

**State Cases**

*Bustamante v. Intuit, Inc.*,
    141 Cal. App. 4th 199 (2006) ...................................................................................3

*Garcia v. Pexco, LLC*,
    11 Cal. App. 5th 782 (2017) .....................................................................................9

*Goldman v. KPMG, LLP*,
    173 Cal. App. 4th 209, 221 (2009) ...................................................................2, 6, 8

**Federal Statutes**

9 U.S.C. § 4.......................................................................................................................5

Cal. Pen. Code § 631.........................................................................................................8

Cal. Pen. Code § 632.........................................................................................................8

1

**I.    INTRODUCTION**

2          In his opposition, Plaintiff does not dispute that he tactically sued Twilio—and not Keeps,

3    whose website and data policies are fundamental to his claims here—to avoid arbitration on an

4    individual basis under New York law, as his arbitration agreement with Keeps validly requires.

5    *See* Dkt. No. 24 ("Opp."); *see also* Dkt. No. 15–1 ("Kanig Decl.") ¶ 5 & Ex. D ¶¶ 16–18 (Keeps

6    Terms).  At the same time, Plaintiff also does not dispute that the doctrine of "[e]quitable estoppel

7    prevents [signatory plaintiffs] from sidestepping [arbitration] agreement[s] by bringing claims

8    only against [related nonsignatories] instead."  *See Young v. ByteDance Inc.*, 700 F. Supp. 3d 808,

9    814, (N.D. Cal. 2023).  Yet Plaintiff opposes Twilio's motion to compel his claims to individual

10   arbitration on equitable estoppel grounds, but only by ignoring Twilio's evidence and the law.

11         ***First,*** Plaintiff falsely contends that Twilio has "done nothing to meet its burden" to prove

12   he agreed to the Keeps Terms containing the arbitration provision.  Opp. at 4.  In doing so, he

13   ignores the sworn declaration from Keeps's General Counsel attesting that he was presented with

14   and necessarily agreed to the Keeps Terms when using and making his purchase on the Keeps

15   website.  *See* Dkt. No. 15–7 ("Jahn Decl.") ¶¶ 2–3.  Plaintiff argues in boilerplate that Keeps's

16   declaration was insufficient evidence but fails to rebut it with any evidence of his own; not even a

17   declaration of his own disputing that he agreed to the Keeps Terms.  This is simply not enough to

18   rebut Twilio's sworn evidence or to put the existence of his agreement genuinely in dispute.  The

19   evidence is undisputed that Plaintiff agreed to the Keeps arbitration agreement.

20         ***Second,*** Plaintiff contends that the Keeps arbitration agreement does not cover his claims

21   about Keeps's collection and disclosure of health information he provided to its website.  Opp. at

22   11–13.  This argument is frivolous.  The arbitration agreement expressly covers "[a]ny dispute,

23   claim, or controversy arising out of or relating in any way to these Terms . . . or your use of the

24   [Keeps] Site."  Kanig Decl. ¶ 5 & Ex. D ¶ 17.  Plainly, this provision covers Plaintiff's claims,

25   which both arise out of and relate to his use of the Keeps website.  *See* Compl. ¶¶ 5–7.  To the

26   extent that Plaintiff is arguing that arbitration agreements cannot validly cover statutory and other

27   noncontractual claims, that position was roundly rejected by the U.S. Supreme Court almost 40

28   years ago.  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

*Finally,* Plaintiff's remaining arguments against the application of equitable estoppel are all wrong as a matter of law.  Signatory plaintiffs are not permitted "to avoid arbitration by suing nonsignatory defendants for claims that are based on the same facts and are inherently inseparable from arbitrable claims against signatory defendants." *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 870–71 (9th Cir. 2021).  Yet that is precisely what Plaintiff did when he filed this suit against Twilio instead of Keeps.  Plaintiff's privacy claims against Twilio are (1) "intimately founded in and intertwined with" the Keeps Privacy Policy, which is incorporated by reference into the Keeps Terms, and (2) he "alleges substantially interdependent and concerted misconduct" between Keeps and Twilio that cannot be resolved without looking to the Keeps Privacy Policy. *See Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 708 (9th Cir. 2024) (citing *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 221 (2009)).  Either of these circumstances is independently sufficient to invoke the doctrine of equitable estoppel, but both are present in this case.

This Court should compel Plaintiff's claims to individual arbitration and stay this case.

## II.    ARGUMENT

### A.    The evidence is undisputed that Plaintiff agreed to the Keeps Terms, including its arbitration provision, class waiver, and choice of law.

The evidence is undisputed that Plaintiff agreed to arbitrate any claim relating to the Keeps Terms and his use of the Keeps website on an individual basis under New York law.  *See* MTCA at 7–8.  Twilio submitted a sworn declaration from Keeps's General Counsel attesting that Plaintiff was "presented with and required to agree to the Keeps Terms" when he created a Keeps account in May 2024.  Jahn Decl. ¶ 2; *see also* Kanig Decl., Exs. D–E (relevant versions of the Keeps Terms).  This evidence shows that "when he created his account on the Keeps website, he necessarily agreed to that arbitration provision and class action waiver." *Id.* ¶ 3.

In opposition, Plaintiff submitted no evidence—not even a self-serving declaration—to rebut Twilio's evidence that he entered into this arbitration agreement with Keeps.  He does not deny that he was presented with the Keeps Terms when he created his Keeps account.  Instead of presenting evidence, he baldly argues only that Twilio's evidence is not sufficient.  But, to do so, he simply *ignores* the Jahn Declaration, which provides the evidence he contends does not exist.

The law is clear that Plaintiff's "metaphysical doubt" is insufficient to genuinely dispute Twilio's evidence of the agreement. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "When deciding whether the parties agreed to arbitrate a certain matter," courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under California law, "[w]here the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed. But if the material facts are certain or undisputed, the existence of a contract is a question for the court to decide." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (2006). The undisputed evidence demonstrates that Plaintiff agreed to arbitration with Keeps when he created his Keeps account. By merely claiming that this evidence is insufficient, Plaintiff is demanding an inference be drawn that there was some unspecified defect in contract formation. But in this context, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts," and his failure to even ***deny*** via a sworn statement that he agreed to arbitrate with Keeps, let alone present any supporting evidence, is insufficient to show a genuine dispute about the existence of the agreement. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 672 (9th Cir. 2021) (summary-judgment framework governs genuine disputes about the existence of an arbitration agreement).

*Hoang v. Citibank*, a decision from another court in this District, is illustrative. *See* 702 F. Supp. 3d 864, 873 (N.D. Cal. 2023). There, the defendant bank moved to compel arbitration based on an arbitration provision in the client manual that it provides to all customers when they open a bank account. *Id.* at 867–68. In opposition, the plaintiff argued that the bank had not met its burden of proving that she saw the client manual and submitted a declaration attesting that she did not "remember the process of opening the account" or whether the bank had given her any documents, and did "not have any such documents in her possession." *Id.* The court held that the plaintiff had "reasonably disputed" the existence of the arbitration agreement. *Id.* at 871–72. But at the same time, it could not "conclude as a matter of law that no agreement to arbitrate was entered," "[e]ven drawing all inferences in [the plaintiff's] favor," because "it remains possible (if

1    not adequately proven) that [the bank] might have provided [the plaintiff] a copy of the Client

2    Manual when she opened her account."  *Id.*  Here, Plaintiff has not "reasonably disputed" that he

3    was presented with the Keeps Terms by even baldly denying it, let alone with a declaration.

4           For the avoidance of any doubt, Plaintiff was presented with and agreed to the Keeps

5    Terms when he created his Keeps account in the form of a standard, enforceable "sign-in wrap"

6    agreement.  *See* Reply Decl. of Ian Kanig ("Kanig Reply Decl."), Ex. F; *see also Peter v.*

7    *DoorDash, Inc.*, 445 F. Supp. 3d 580, 586 (N.D. Cal. 2020) (citing *Meyer v. Uber Techs., Inc.*,

8    868 F.3d 66, 76 (2d Cir. 2017) (holding that sign-in wrap agreements are found "valid where the

9    existence of the terms was reasonably communicated to the user")).  Keeps prompted Plaintiff to

10   enter his name and email and click a "CONTINUE" button to begin the account creation process.

11   Beneath that button, Keeps informed Plaintiff that, "By continuing, you agree to accept our Terms

12   & Conditions and Privacy Policy."  Kanig Reply Decl., Ex. F.  The "Terms & Conditions" and

13   "Privacy Policy" language are conspicuously underlined hyperlinks on an otherwise blank white

14   part of the page that put Plaintiff on inquiry notice of these terms.  Indeed, a materially-identical

15   version of this screen exists on the Keeps website today.  Kanig Reply Decl., Ex. G.  This sign-in

16   wrap agreement is confirmed by the Keeps Terms, which provides, "By clicking 'accept' or

17   otherwise using the Service, you acknowledge that you have read, understand, and accept all

18   terms and conditions contained within these Terms[.]"  Kanig Decl., Ex. D ¶ 1.

19          Plaintiff's improper request for arbitration discovery in the event that he does not prevail

20   on this issue should be denied.  Opp. at 13–14.  Arbitration discovery is warranted only if "the

21   making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in

22   issue."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999).  And a party waives any

23   right to such discovery by belatedly asking the court to order discovery on the condition that he

24   does not prevail.  *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019).  Here, Plaintiff

25   does not allege any specific defect in his necessary agreement to the Keeps Terms could warrant

26   discovery, *see Simula*, 175 F.3d at 726, and he has in any case waived any right to seek discovery

27   by asking for discovery on the condition that he does not prevail, *Wilson*, 944 F.3d at 1220.  This

28

1   Court is thus left with an uncontested record showing that Plaintiff agreed to the Keeps Terms.[1]

2   **B.    The scope of Plaintiff's arbitration agreement, which includes any dispute relating to his use of the Keeps website, covers his claims in this action.**

3

4   Plaintiff's argument that the arbitration provision in the Keeps Terms does not cover his

5   privacy claims that arise out of his use of the Keeps website is frivolous. *See* Opp. at 11–13. To

6   determine whether a party's claims fall within the scope of an arbitration provision, courts look to

7   its plain language. *Franklin*, 998 F.3d at 872. The arbitration provision in the Keeps Terms

8   covers "[a]ny dispute, claim, or controversy arising out of or relating in any way to these Terms;

9   the . . . enforcement, interpretation or validity thereof; . . . or your use of the [Keeps] Site,

10  including products purchased or Service rendered through the Site[.]" Kanig Decl., Ex. D ¶ 17.

11  Plaintiff's claims concern his use of the Keeps website to answer a questionnaire and then make a

12  purchase, and Keeps's alleged improper sharing of that personal information with Twilio (as

13  governed by the Keeps Terms and Keeps Privacy Policy). Compl. ¶¶ 3–7; *see also* MTD at 4–6.

14  There can be no dispute that Plaintiff's claims about his use of the Keeps website thus arise out

15  of—or at least relate to—his use of the Keeps website. *See, e.g.*, *La Force v. GoSmith, Inc.*, No.

16  17-CV-05101-YGR, 2017 WL 9938681, at *1 (N.D. Cal. Dec. 12, 2017) (enforcing a provision

17  covering "any claim" "relating to" "in any way the Agreement or use of the Website").

18  Further, the Keeps Privacy Policy, which is expressly incorporated into the Keeps Terms

19  (as discussed below in additional detail), governs Keeps's right to share this customer data with

20  third-party software service providers like Twilio for marketing and advertising purposes. Kanig

21  Decl., Ex. A ¶¶ 3, 7–8; *see also* MTD at 4–5. For that reason, Plaintiff's claims also plainly arise

22  out of—or at least relate to—the "interpretation" of the Keeps Terms. *Id.*, Ex. D ¶ 17. *See*

23  *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994) (a claim

24  "arising out of" a contract "relat[es] to the interpretation and performance of the contract").

25  Plaintiff's citation to *Jackson v. Amazon.com* is inapposite. *See* 65 F.4th 1093, 1095–96

26  (9th Cir. 2023). In that case, the plaintiff, who worked as a delivery driver for Amazon, alleged

27
28
---
[1] Should this Court determine that there is a genuine dispute of material fact as to the "the making of the arbitration agreement," the parties should "summarily proceed" to trial on that issue. *See* 9 U.S.C. § 4; *Hoang*, 702 F. Supp. 3d at 873 (ordering trial on existence of arbitration agreement).

that Amazon improperly monitored his conversations with other drivers in a Facebook group, in violation of federal privacy statutes. *Id.* at 1096. Amazon moved to compel arbitration based on the employment agreement that the plaintiff had signed, which covered "any dispute or claim . . . arising out of or relating in any way to this Agreement, including . . . participation in the program or . . . performance of services." *Id.* The court held that the plaintiff's allegations did not "touch matters covered by that arbitration clause" because Amazon's alleged surveillance had no "direct relationship" to his employment or his employment contract. *Id.* at 1101–04. That disconnect—between an employment agreement and unrelated privacy claims—simply does not exist here. Here, Plaintiff's claims relate to information collected about him on the Keeps website during his use of the Keeps website, which plainly arise out of and relate to his use of the Keeps website.

Finally, to the extent Plaintiff is arguing that arbitration agreements cannot cover statutory and other noncontractual claims because those claims can never have a "direct relationship" with the underlying contract, that argument is a dead letter. *See Mitsubishi Motors*, 473 U.S. at 626 (holding that statutory claims that exist independent of a contract are arbitrable under the FAA).

### C. Plaintiff's remaining arguments against equitable estoppel are legally flawed.

Plaintiff does not dispute that equitable estoppel exists to prohibit a plaintiff's "attempts to avoid arbitration by suing nonsignatory defendants for claims that are based on the same facts and are inherently inseparable from arbitrable claims against signatory defendants." *See Franklin*, 998 F.3d at 870. He also does not dispute that the policy considerations underlying the doctrine are heightened when a nonsignatory plaintiff simultaneously seeks to avoid both a class action waiver and substantive choice-of-law provision that would otherwise prohibit his claims in arbitration against the unnamed signatory. And he does not dispute that this is precisely the unfair litigation tactic he has employed by suing Twilio in this lawsuit instead of Keeps, the unnamed signatory.

The only remaining issue is whether one of the two circumstances warranting equitable estoppel is present in this case. Both of those circumstances are present here: (1) Plaintiff's claims against Twilio are "intimately founded in and intertwined with" the Keeps Privacy Policy; and (2) the complaint "alleges substantially interdependent and concerted misconduct" between Keeps and Twilio. *See Herrera*, 104 F.4th at 708–10 (citing *Goldman*, 173 Cal. App. 4th at 221).

1. **Plaintiff's claims are intimately intertwined with the Keeps Privacy Policy, which are incorporated by reference into the Keeps Terms.**

Plaintiff does not dispute the core reason why the first circumstance of equitable estoppel exists here. Plaintiff's privacy claims require him to plead and prove to the factfinder that he did not authorize or consent to the data practices that he challenges. MTCA at 9–10. To resolve that issue, the factfinder will unquestionably have to interpret the Keeps Privacy Policy because that document defines the privacy rights and obligations of the parties. *Id.* at 10–11. Thus, Plaintiff's privacy claims are "bound up with" the Keeps Privacy Policy. *Id.* at 11–13. Because Plaintiff cannot truly dispute this reality, he picks around the edges of Twilio's motion with a handful of half-baked legal arguments and unhelpful citations. None are sufficient to defeat arbitration.

a. **The Keeps Terms validly incorporate the Keeps Privacy Policy, and thus the documents must be treated as a unified contract.**

Plaintiff contends that the first circumstance of equitable estoppel cannot exist in this case because the Keeps Privacy Policy is not part of the same contract as the Keeps Terms. Opp. at 7. This argument immediately fails because the Keeps Privacy Policy is validly incorporated into the Keeps Terms by reference. Under California law, a document is incorporated by reference where (1) "the incorporation is clear and unequivocal," (2) "the reference [is] called to the attention of the other party," and (3) "the terms of the incorporated writing [are] known or easily available to the contracting parties." *In re Holl*, 925 F.3d 1076, 1084 (9th Cir. 2019). When these conditions are satisfied, the documents are "read together as a single document." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1269 (9th Cir. 2017).

In this case, in the first paragraph of the Keeps Terms, which is entitled "**AGREEMENT, ACKNOWLEDGEMENT, AND ACCEPTANCE OF TERMS**," Keeps informs its users that "You agree that information provided by you in connection with our Service shall be governed by the Privacy Policies, which are incorporated and made a part of these Terms." Kanig Decl., Ex. A ¶ 1 (emphasis in original). The first paragraph conspicuously informs users that "[b]y clicking accept or otherwise using the Service, you acknowledge that you have read, understand, and accept all conditions contained within these Terms, our Privacy Policy [hyperlink], KMG

Medical Groups' <u>Notice of Privacy Practices</u> [hyperlink], and Hudson NYC Medical's Notice of Privacy Practices (collectively, the 'Privacy Policies').  You agree that information provided by you in connection with our Service shall be governed by **the Privacy Policies**, which **are hereby incorporated and made a party of these Terms**."  Kanig Decl., Ex. D ¶ 1 (emphasis added).  The terms of the Keeps Privacy Policy are available by an easily accessible, conspicuous hyperlink.

Thus, the Keeps Terms validly incorporated by reference the Keeps Privacy Policy.  The Keeps Terms clearly and unequivocally direct the reader to the linked Keeps Privacy Policy, this is done in the first paragraph which conspicuously alerts the user to the nature of its contents, and the terms of the Privacy Policy are easily known because a user need only click on the hyperlink or visit the Keeps website to view them in their entirety.  Accordingly, the Keeps Terms and Keeps Privacy Policy are treated as a single, enforceable contract, and Plaintiff's argument fails.

> b.    **Plaintiff does not dispute that his claims hinge on the Keeps Privacy Policy, but argues for an incorrect legal standard.**

Plaintiff's only other argument is that his privacy claims are not sufficiently intertwined with the Keeps Privacy Policy because his complaint does not expressly cite and rely upon it to state his claims.  Opp. at 8–9.  But the Ninth Circuit has squarely rejected this argument.  "It is the substance of the plaintiff's claim that counts, not the form of its pleading." *Franklin*, 998 F.3d at 875.  Thus, even in cases where "[the plaintiff] omits any mention of [the other signatory] from [the] complaint," the plaintiff's claims are still "intimately founded in and intertwined with" their contract where "the substance of [the plaintiff's] claims is rooted in" and "cannot be answered without reference to [their contract]." *Id.* at 875–76; *see also Herrera*, 104 F.4th at 710 (sufficient intertwinement exists where allegations "are in *any way* founded in or bound up with the terms or obligations in the operating agreement") (quoting *Goldman*, 173 Cal. App. 4th at 230).  Here, Plaintiff does not dispute that his claims require him to plead and prove he did not authorize or consent to Keeps's collection and sharing of his personal health information with third-party service providers like Twilio.  Compl. ¶¶ 3–6 (generally), ¶ 76 (CIPA § 631 claims), ¶ 86 (CIPA § 632 claim), ¶ 89 (constitutional and common law invasion-of-privacy claims).  Thus, the fact that Plaintiff studiously avoided alerting this Court to the document that his claims turn

upon is not the successful defense to equitable estoppel that Plaintiff seems to think that it is.

Plaintiff's district court authorities do not help him overcome this precedent. Indeed, his primary authority, *Smith v. Google LLC*, is easily set aside for failing to follow the Ninth Circuit's holding in *Franklin*. *See* No. — F. Supp. 3d ——, 2024 WL 1171653 (N.D. Cal. Mar. 19, 2024). *Smith*'s first clear legal error was rejecting the possibility that statutory claims can be subject to equitable estoppel unless they "rel[y] directly on the terms of [the contract.]" *Id.* at \*3. But the Ninth Circuit had rejected this precise argument in *Franklin* several years earlier. 998 F.3d at 872 (affirming order compelling arbitration on equitable estoppel grounds of statutory wage-and-hour claims not predicated on the enforcement of the terms of the underlying employment agreement) (discussing *Garcia v. Pexco, LLC*, 11 Cal. App. 5th 782 (2017)). Indeed, the *Smith* court itself completely changed course and reached the correct conclusion a few months later in the related case of *Hunt v. Meta Platforms*. *See* — F. Supp. 3d ——, 2024 WL 2503118, at \*2–3 (N.D. Cal. May 24, 2024) (compelling arbitration of statutory claim on equitable estoppel grounds).

*Smith*'s second clear legal error was holding that the California Invasion of Privacy Act ("CIPA") claims did not require interpretation of the unnamed signatory's privacy policy to determine whether there was authorization or consent. *See* 2024 WL 1171653, at \*3. Instead, without citation to any authority, the court held that consent was an affirmative defense and thus intertwinement with the plaintiff's claims was impossible. *Id.* But each of Plaintiff's invasion-of-privacy claims require him to plead a lack of authorization or consent, MTCA at 9–10, and Plaintiff does not contest that this is a claim element. In any case, what ultimately matters is "the substance of the plaintiff's claim," which is why courts look to "the relationships of persons, wrongs and issues" alleged in the complaint, regardless of whether the plaintiff references the underlying contract with the arbitration agreement. *Franklin*, 998 F.3d at 871, 875. Under that framework, Plaintiff's claims cannot be answered without reference to the Keeps Privacy Policy.

Plaintiff's only other relevant authority—*Ellington v. Eclipse Recreational Vehicles*—is inapposite. *See* No. 21–55021, 2022 WL 72351, at \*1 (9th Cir. Jan. 7, 2022). There, the plaintiff's implied warranty claim by definition did not depend on the terms of the underlying purchase contract; they were implied. *Id.* That, of course, is not the case here. Plaintiff's claims

1  hinge on the Keeps Privacy Policy, which are express terms to which he and Keeps agreed.

2          **2.      Plaintiff barely disputes that his privacy claims against Twilio are
               predicated on interdependent misconduct between Twilio and Keeps.**
3

4          Finally, Plaintiff does not meaningfully contest that he alleges "concerted misconduct"

5  between Keeps and Twilio that cannot be resolved without reference to Keeps's contract with

6  Plaintiff.  MTCA at 13–15 (citing *Herrera*, 104 F.4th at 711; *Hunt*, 2024 WL 2503118, at *3).

7  Nor can he.  The core theory of his case is that Keeps colluded with Twilio to secretly collect and

8  use Keeps customer information for their mutual profit, and his complaint is thus replete with

9  allegations of this kind of collusive conduct between Keeps and Twilio.  Compl. ¶¶ 3 (alleging

10  contractual agreement between Twilio and Keeps that "enabled" them to enact their alleged data-

11  collection scheme); *id.* ¶¶ 27–51 (alleging deployment of this joint scheme); *id.* ¶ 56 (alleging that

12  "the agreement for [Twilio] to wiretap [Keeps's customers'] communications on the [Keeps]

13  Website is done for the purpose of improperly increasing the advertising efficacy and, by

14  extension, profits of both parties").  Plaintiff does not even try to distinguish Twilio's authorities.

15          Instead, Plaintiff again relies on *Smith v. Google* to support his argument, but again this

16  reliance is misguided.  *See* Opp. at 10–11 (citing 2024 WL 1171653, at *3).  In *Smith*, the court

17  held that there were insufficient allegations of collusion to warrant equitable estoppel because the

18  plaintiffs "do not allege that Google instructed the Websites to transmit to Google the purported

19  financial data" or that the software provider had acted any "differently from how it interacted

20  with any other user of its off-the-shelf tracking tools."  *Smith*, 2024 WL 1171653, at *3.  Those

21  are not the facts here.  Plaintiff alleges that Twilio and Keeps contracted for Twilio to provide

22  Keeps with its Segment software so that the parties could mutually benefit by improperly sharing

23  Keeps customer data.  Compl. ¶ 56.  In any case, the *Smith* court ultimately recanted its logic in

24  the related case of *Hunt v. Meta Platforms*, finding there were likely sufficient allegations of

25  collusion to warrant the application of equitable estoppel.  *See* 2024 WL 2503118, at *3.  Thus,

26  the only basis on which Plaintiff opposes this second application of equitable estoppel is illusory.

27  **III.    CONCLUSION**

28          This Court should compel Plaintiff's claims to individual arbitration and stay this case.

1

Dated:  October 10, 2024                          KEKER, VAN NEST & PETERS LLP

2

3                                                    By:    /s/ Ian Kanig
                                                          BENJAMIN BERKOWITZ
4                                                         CHRISTINA LEE
                                                          IAN KANIG
5

6                                                         Attorneys for Defendant
                                                          TWILIO INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF TWILIO'S MOTION TO COMPEL INDIVIDUAL ARBITRATION
Case No. 3:24-CV-03741-VC

2798272